UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                                        Case No. 8:22-cr-387-SDM-CPT

JULIUS SIMMONS
_____/

## REPORT AND RECOMMENDATION

Before me on referral is Defendant Julius Simmons's motion to suppress evidence obtained as a result of a traffic stop of his vehicle by the Tampa Police Department (TPD).  (Doc. 38).  The government filed a response in opposition to Simmons's motion.  (Doc. 40).  After reviewing these submissions and hearing oral argument on the matter (Docs. 44, 48), I determined that an evidentiary hearing was necessary.  (Docs. 49, 53).  Three TPD officers testified at that proceeding, Brittany Hendrix, Sergio Sanchez, and Bryan Velazquez.  (Doc. 63).

Following the hearing, I directed the parties to file proposed findings of fact and conclusions of law (Doc. 55),[1] as well as a supplemental notice addressing two matters

---

[1] The parties were instructed that their proposed findings of fact and conclusions of law must "contain *all* facts and legal authority that the parties wish the Court to consider" and must "not incorporate by reference any prior legal memoranda submitted to the Court."  (Doc. 55 at 1) (emphasis added).  In light of this instruction, I do not address any factual assertions or legal arguments other than those contained in these filings.

discussed at a later hearing, (Docs. 69, 71, 72).   The parties complied with these directives.  (Docs. 64, 65, 73).

Based upon my analysis of the parties' submissions, the testimony and exhibits introduced at the evidentiary hearing, and other pertinent portions of the record, I respectfully recommend that Simmons's motion be denied.  Below are my findings of fact and conclusions of law that lead me to this recommendation.  Unless otherwise indicated, my factual findings are derived from my assessment of the weight of the evidence offered by the parties, including the testimony of the above witnesses.

## I.

During the early morning hours on June 14, 2022, Hendrix was in a police car conducting "proactive patrol" as a member of TPD's street crimes unit.  (Doc. 63 at 10–12).   Hendrix was outfitted with a body camera on her torso that commenced recording when the emergency lights on her vehicle were activated or when she manually turned on the body camera.  *Id*. at 20–22.

A roughly eight-year law enforcement veteran at the time, Hendrix had performed thousands of traffic stops by that point in her career.  *Id*. at 8–9.  As pertinent here, it was common for Hendrix to come across firearms during these encounters, many of which were stored in the vehicles' glove box, within the center console, or under the seat.  *Id*. at 9–10.

Shortly after 1 a.m., Hendrix observed a Mercedes sedan with an inoperable headlight in a high-crime area and decided to stop it.[2] (Docs. 54 Exh. 1; 63 at 11–14, 57, 69–70). Upon being pulled over by Hendrix, the driver and sole occupant of the Mercedes, Simmons, "immediately exited the vehicle" and was admonished by Hendrix to get back in the car, which Simmons did. (Docs. 54 Exh. 1; 63 at 13–14). Hendrix testified at the hearing that she found this action by Simmons to be suspicious, explaining that when someone "tries to walk away [from an automobile at a traffic stop], typically in my experience, there's something in the vehicle that they don't want me to see or be around." (Doc. 63 at 49–50).[3]

With her body camera on, Hendrix proceeded to the driver's side window of Simmons's sedan and stood at the car's "B" pillar, which separated the front and rear passenger-side doors. *Id.* at 14–15; (Doc. 54 Exh. 1).[4] Hendrix informed Simmons of the reason why he was pulled over, obtained Simmons's driver's license, and then left Simmons's vehicle to return to her squad car so she could "run . . . [Simmons's] driver's license to see if there [were] any illegal things that popped up." (Docs. 54 Exh. 1; 63 at 14–15, 20). As Hendrix was concluding her discussion with Simmons, two members of her squad—Velazquez and Sanchez—arrived at the scene. (Docs. 54 Exhs. 2, 3; 63 at 17–18, 29, 57, 107). Like Hendrix, Velazquez and Sanchez had both

---

[2] Hendrix had seen the same car with the inoperable headlight earlier in the evening but did not attempt to stop it at that point because she was called away to assist with another call. (Doc. 63 at 12).

[3] Sanchez later testified that he similarly found it to be abnormal for a driver "to immediately exit [a] car" upon being stopped by the police. (Doc. 63 at 55).

[4] According to Sanchez's subsequent testimony, officers are trained to stand at the B pillar. (Doc. 63 at 56).

been members of law enforcement for roughly eight years and had participated in numerous traffic stops.  (Doc. 63 at 52–53, 102–03).  They too commonly came across weapons during such stops, including ones located under the seat.  *Id.* at 53–54, 103–05.  As with Hendrix, Velazquez and Sanchez were also equipped with body cameras affixed to their torsos, which they likewise activated.  *Id.* at 62, 106, 127–28; (Doc. 54 Exhs. 2, 3).

Velazquez and Sanchez approached Simmons's vehicle, positioned themselves at the B pillar of the driver and front passenger side doors, respectively, and began talking to Simmons through the car windows, which were rolled down.  (Docs. 54 Exhs. 2, 3; 63 at 18, 57–58, 107–08).  Velazquez largely took the lead during this conversation and periodically directed a flashlight at Simmons as he communicated with him.  (Docs. 54 Exhs. 2, 3; 63 at 57, 108–112).  Although Simmons was cooperative and respectful, Velazquez and Sanchez perceived him to be distracted and intent on limiting his dialogue with Velazquez and Sanchez as much as possible.  (Doc. 63 at 30, 57, 70–72, 108–09, 121, 123–24).  When Velazquez inquired of Simmons whether he was traveling to or from work, for example, Simmons offered the non-responsive answer, "No, Sir," without making any effort to elaborate.  *Id.* at 109, 121–22; (Doc. 54 Exh. 3).  Velazquez also noted that Simmons initially seemed to avoid making eye contact with him, including by regularly looking at his cellphone, which

Simmons claimed was because he was trying to find his insurance.[5] (Docs. 54 Exhs. 2, 3; 63 at 57–58, 108–09, 111, 120–123). In addition, early on in his interaction with Velazquez and Sanchez, the music in Simmons's car significantly increased in volume, which Sanchez found to be "very unusual." (Docs. 54 Exhs. 2, 3; 63 at 58, 70–71).[6] In fact, Sanchez testified that, in his experience, if someone had their music on when they were pulled over by the police, "they[ would] turn it down to see what we ha[d] to say." (Doc. 63 at 58).

And finally, asserting at one point that the officers' flashlights were bothering him, Simmons rolled up the driver's and passenger's side windows even though Velazquez was still trying to speak with him. *Id.* at 58, 71, 79, 90, 111–12, 124; (Doc. 54 Exhs. 2, 3). According to Sanchez, Simmons did this right after Sanchez shined his flashlight in the rear window and looked in the back seat. (Doc. 63 at 58, 71, 79, 90). Simmons's closure of these windows made it more difficult for the officers to see inside his vehicle. *Id.* at 112.

When Velazquez then relocated to the rear driver's side window (which was still open) so that he could converse with Simmons further, Simmons rolled up that

---

[5] In response to this claim by Simmons, Velazquez told Simmons that he did not have to worry about his insurance and added that he could tell Velazquez to "shut the hell up and leave [him] alone and [Velazquez would] be like[,] 'okay.'" (Docs. 54 Exh. 3; 63 at 123–24).

[6] Sanchez testified that he did not observe Simmons turn a knob on his radio before the music got louder and speculated that Simmons may have utilized his phone to do so. (Doc. 63 at 70–71). While Sanchez was ultimately "not sure about" the matter, he was certain "that the volume went up as [he and Velazquez] started talking" to Simmons. *Id.* It also appears from the bodycam footage that Simmons did not attempt to reduce the volume of the music until Hendrix later returned to talk with him. (Doc. 54 Exhs. 2, 3).

window too.  (Docs. 54 Exh. 3; 63 at 111, 124).  This led Velazquez to remark to Sanchez that Simmons was essentially telling Velazquez to "shut-up."  (Docs. 54 Exh. 3; 63 at 126).  Both Velazquez and Sanchez deemed these actions by Simmons to be out of the ordinary.  (Doc. 63 at 58, 111, 120–21).

Shortly thereafter, Hendrix retuned to Simmons's sedan having completed her check of his driver's license and after having learned that he was both a convicted felon and on probation.  *Id.* at 15–18, 20, 50; (Doc. 54 Exh. 1).  Hendrix proceeded again to the driver's side front window and again stood next to the B pillar.  (Docs. 54 Exhs. 1, 2, 3; 63 at 17–18, 33, 112).  As evidenced by his bodycam recording, Velazquez, in turn, relocated himself towards the front of the vehicle in the area of the "A" pillar, which divided the driver's side front door from the front windshield and which also housed the side-view mirror.  (Docs. 54 Exh. 3; 63 at 18, 64, 112–13).  This shift in Velazquez's vantage point enabled him to view Simmons's body more from the front, rather than from the side.  (Doc. 63 at 64).

As Hendrix assumed her position at the B pillar, Simmons rolled down his driver's side front window and complained to Hendrix that Velazquez and Sanchez were "talking a lot." *Id.* at 18; (Doc. 54 Exhs. 1, 3).  After doing so, Simmons leaned back, "scooch[ed]" down, and further separated and elevated his legs, which were bent.  (Docs. 54 Exh. 3; 63 at 59–60, 63, 65, 114, 117).  Hendrix then advised Simmons that he was not the subject of any outstanding warrants and that although he was free to go, he needed to fix his headlight.  (Docs. 54 Exhs. 1, 3; 63 at 16, 18–19).

While Hendrix was reviewing these items with Simmons, Velazquez used this opportunity "to spend more time looking into [Simmons's] car" for "obvious things" located near Simmons, like a weapon.  (Doc. 63 at 113, 149).  Velazquez did so by moving further left and forward, which afforded him a better angle to examine the area under Simmons's seat, which is where he then pointed his flashlight.  *Id.* at 63–65, 113–114; (Doc. 54 Exh. 3).  At the hearing, Velasquez explained that he focused on this area during traffic stops because it was "within immediate reach" of the driver and was where he knew weapons were sometimes stowed.  (Doc. 63 at 110); *see also* (Doc. 63 at 53–54, 103–05).

Within a second or two, Velazquez noticed the handle of a firearm[7] through a gap in a cloth seat cover that extended over the edge of Simmons's seat.  (Docs. 54 Exhs. 1, 3; 63 at 39, 47, 113–17, 128–30, 134–36).  Immediately upon making this discovery, Velazquez commanded Simmons to step out of the car for officer safety reasons[8] and handcuffed Simmons outside the vehicle.  (Docs. 54 Exhs. 1, 3; 63 at 19, 39, 47, 60, 110, 115–16).  As he was doing so, Velazquez told Hendrix, "under the seat" (Docs. 54 Exhs. 1, 3; 63 at 20, 40, 116) and seconds later questioned Simmons why he did not tell them that he had a gun in his vehicle (Doc. 54 Exh. 3).  Hendrix understood Velazquez's reference to "under the seat" to mean that a firearm was

---

[7] Velazquez testified that he "could see the actual magazine inserted into the firearm as well" and that the magazine was located "further toward[s] the front."  (Doc. 63 at 129, 134–35).

[8] Consistent with Velazquez's concerns about officer safety, Hendrix stated during her testimony that an "unsecured firearm" under a seat within arm's reach of the driver—like the gun in Simmons's Mercedes—presented a danger to law enforcement.  *Id.* at 46.

located there, and she independently inquired of Simmons whether he had been "acting like that" because of the presence of a weapon in his car.  (Docs. 54 Exhs. 1, 3; 63 at 20, 47, 50).

Velazquez promptly followed this query by asking Simmons if he had a concealed weapons permit and if he was a convicted felon.  (Docs. 54 Exhs. 1, 3; 63 at 62, 116).  Simmons answered the first question in the negative and the second in the affirmative.  (Docs. 54 Exhs. 1, 3; 63 at 62).[9]  At the same time, Hendrix separately advised Velazquez that Simmons was a convicted felon and that "he [was] on probation."  (Docs. 54 Exhs. 1, 3; 63 at 62, 116).  Almost immediately thereafter, Sanchez told Velazquez and Hendrix that the weapon explained why Simmons had been acting "so weird."  (Doc. 54 Exhs. 2, 3).

Without receiving Simmons's permission to do so, Hendrix subsequently lifted up the seat cover on Simmons's seat (Docs. 54 Exh. 1; 63 at 20, 34–35, 47–49, 89, 130), and found the weapon spotted by Velazquez—a Taurus Armas Model PT111 G2, 9MM semi-automatic pistol[10]—under the seat, near the center console (Docs. 54 Exh. 1; 63 at 20, 45; 65 at 1).  While neither Hendrix nor Sanchez had previously seen

---

[9] At the hearing, defense counsel posed the following leading question to Velazquez, "[A]t the time you . . . removed [Simmons from the vehicle], you did not inquire whether or not [Simmons] was not permitted from having a firearm, did you?"  (Doc. 63 at 145).  Velazquez answered, "No, Sir."  *Id.*  The problem with defense counsel's question and Velazquez's answer is that it is clear from the bodycam footage that Velazquez did, in fact, ask Simmons whether he had a concealed carry permit and whether he was convicted felon, either of which would have prohibited Simmons from possessing a firearm.  (Doc. 54 Exh. 3).  I therefore assign little weight to this exchange between defense counsel and Velazquez.

[10] Velazquez testified that semi-automatic handguns are the ones most commonly seen during traffic stops and also the type he carries.  (Doc. 63 at 105).

8

the gun (Doc. 63 at 34–35, 42, 81, 88), they and Velazquez all agreed that—in their experience—weapons hidden beneath a car seat are often not lawfully possessed. (Doc. 63 at 44, 54, 104).  Hendrix also found a pill bottle containing more than seven grams of MDMA near the firearm as well.  (Docs. 54 Exh. 1; 63 at 41; 64 at 5).

By way of the instant motion, Simmons now requests that the Court suppress the items seized from his car, along with the statements he made after he was detained and the results of a later court-authorized DNA swab of his cheek.  (Doc. 65 at 1).  In support of this relief, Simmons maintains that all of these items were obtained in violation of the Fourth Amendment or constitute "fruit of the poisonous tree."  *Id.*

## II.

### A.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.  A search or seizure will generally be deemed to be reasonable for Fourth Amendment purposes if it is executed pursuant to a warrant issued on probable cause.  *Howell v. Bradshaw*, 2009 WL 10710388, at *11 (S.D. Fla. Feb. 17, 2009) (citing *Skinner v. Railway Lab. Execs'. Ass'n*, 489 U.S. 602, 619 (1989); *Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 667 (1989)), *aff'd*, 349 F. App'x 399 (11th Cir. 2009).[11]

---

[11] Unpublished opinions are not considered binding precedent but may be cited as persuasive authority. 11th Cir. R. 36-2.

"A traffic stop for a suspected violation of law is a 'seizure' of the occupants of the vehicle and therefore must be conducted in accordance with the Fourth Amendment." *Heien v. North Carolina*, 574 U.S. 54, 60 (2014) (quoting *Brendlin v. California*, 551 U.S. 249, 255–59 (2007)). To support a traffic stop, an officer need only demonstrate "reasonable suspicion—that is, a particularized and objective basis for suspecting the particular person stopped of breaking the law." *Id.* (internal quotation marks and citation omitted); *see also United States v. Campbell*, 26 F.4th 860, 880 & n.15 (11th Cir. 2022) (observing the Supreme Court has "made clear" that "only reasonable suspicion is necessary" to stop a vehicle) (citing *Heien*, 574 U.S. at 60); *Baxter v. Roberts*, 54 F.4th 1241, 1256 (11th Cir. 2022) ("A traffic stop is constitutional if the officer had reasonable suspicion to believe that criminal activity has occurred, is occurring, or is about to occur.") (citing *Campbell*, 26 F.4th at 880).

Reasonable suspicion is "a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). The reasonable suspicion standard, however, is not a toothless one. To cross this threshold, an officer must have "at least a minimal level of objective justification" for the stop, not merely "an 'inchoate and unparticularized suspicion or "hunch" of criminal activity.'" *Id.* at 123–24 (quoting *Terry v. Ohio*, 392 U.S. 1, 27 (1968)).

When evaluating a traffic stop under the Fourth Amendment, courts must also consider whether the stop was "reasonably related in scope to the circumstances" that

warranted it in the first place. *United States v. Gibbs*, 917 F.3d 1289, 1294 (11th Cir. 2019). The tasks an officer may perform during a traffic stop include "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Rodriguez v. United States*, 575 U.S. 348, 355 (2015). In addition, an officer may "attend[ ] to any related safety concerns, including '[those that] stem[ ] from the mission of the stop itself.'" *United States v. Burwell*, 763 F. App'x 840, 850 (11th Cir. 2019) (quoting *Rodriguez*, 575 U.S. at 356). The police may therefore take measures "that are reasonably necessary to protect their personal safety[, ] . . . including requiring the driver and [any] passengers to exit the vehicle as a matter of course." *Gibbs*, 917 F.3d at 1295 (internal quotation marks and citations omitted).

Where suspicious circumstances come to an officer's attention during the course of a lawful traffic stop, the officer has a duty to investigate them. *United States v. Holt*, 777 F.3d 1234, 1257 (11th Cir. 2015) ("[W]hen the officer [has] developed reasonable, articulable suspicion of other illegal activity, he permissibly could, and indeed had a duty to, investigate further.") (citations omitted); *United States v. Cantu*, 227 F. App'x 783, 785 (11th Cir. 2007) (same). Thus, an officer may lengthen the duration of the stop to engage in further questioning beyond that related to the initial stop if the officer has an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring. *United States v. Pruitt*, 174 F.3d 1215, 1220 (11th Cir. 1999); *United States v. Vargas*, 848 F.3d 971, 974–75 (11th Cir. 2017).

Under the automobile exception, an officer may search a car without a warrant or consent if the car is "readily mobile (i.e., operational)," and there is probable cause to support the search. *United States v. Tamari*, 454 F.3d 1259, 1261 (11th Cir. 2006) (citations omitted). "Probable cause exists when there is a fair probability that contraband or evidence of a crime will be found in the vehicle[.]" *United States v. Dixon*, 901 F.3d 1322, 1339 (11th Cir. 2018) (internal quotation marks and citation omitted). Probable cause can be present, however, even if the officer's "belief of fact" is mistaken, provided that the officer's factual error is reasonable under the circumstances. *United States v. Gonzalez*, 969 F.2d 999, 1006 (11th Cir. 1992) ("A policeman's mistaken belief of fact can properly contribute to a probable cause determination and can count just as much as a correct belief as long as the mistaken belief was reasonable in the light of all the circumstances.").

Once there is probable cause to search an automobile, "the police may search all parts of the vehicle, and any containers, therein, where the object of the search might be found." *United States v. Baldwin*, 774 F.3d 711, 720 (11th Cir. 2014) (citation omitted). Searches authorized under the automobile exception extend to "searches for evidence relevant to offenses other than the offense of arrest." *Arizona v. Gant*, 556 U.S. 332, 347 (2009).

In the end, whether the police had reasonable suspicion or probable cause is based upon "the totality of the circumstances." *United States v. Sheckles*, 996 F.3d 330, 343 (6th Cir. 2021) (noting that reasonable suspicion and probable cause "turn[ ] on the same totality of the circumstances") (citing *United States v. Cortez*, 449 U.S. 411,

417–18 (1981)). In making this assessment, courts may consider the collective knowledge of all the officers involved in the stop. *United States v. Dixon*, 491 F. App'x 120, 122 (11th Cir. 2012) (citing *United States v. Cotton*, 721 F.2d 350, 352 (11th Cir. 1983)). Courts may also take into account law enforcement's experience and training in evaluating such matters. *See United States v. Slocum*, 708 F.2d 587, 605 (11th Cir. 1983) ("[A]n agent may rely on his special experience and knowledge in determining whether . . . reasonable suspicion or probable cause exists."); *see also United States v. Gant*, 756 F. App'x 898, 900 (11th Cir. 2018) (per curiam) (stating that a "police officer may draw inferences based on his own experience in deciding whether probable cause exists") (quoting *Ornelas v. United States*, 517 U.S. 690, 700 (1996)).

## B.

Applying these principles here, I find that Simmons's Fourth Amendment challenge is without merit. As an initial matter, there is no dispute that Simmons's Mercedes had an inoperable headlight and that Hendrix therefore had reasonable suspicion to stop the vehicle. *See Campbell*, 26 F.4th at 880 (noting that "[e]ven minor traffic violations qualify as criminal activity" for purposes of the reasonable suspicion analysis) (citing *United States v. Chanthasouxat*, 342 F.3d 1271, 1277 (11th Cir. 2003); *Holeman v. City of New London*, 425 F.3d 184, 189–90 (2d Cir. 2005)); *see also* (Doc. 65 at 2).

Hendrix and her fellow officers, Velazquez and Sanchez, also had an ample basis to search the vehicle under the automobile exception. With the respect to the first prong of this exception—i.e., whether Simmons's Mercedes was "readily mobile,"

13

it is evident from the record that the car was operational at the time of the search. *United States v. Watts*, 329 F.3d 1282, 1286 (11th Cir. 2003) ("The first [question for the automobile exception] is whether the automobile is readily mobile.   All that is necessary to satisfy this element is that the automobile is operational.").   Hendrix testified to this effect (Doc. 63 at 11–14), and Simmons essentially conceded the point at oral argument (Doc. 48).

As to the exception's second prong—i.e., whether there was "probable cause to believe [Simmons's] vehicle contain[ed] contraband or evidence of a crime," *Tamari*, 454 F.3d at 1261, even before the discovery of the firearm, Simmons was behaving in a manner that all three officers deemed to be atypical.  As described more fully above, for example, Simmons seemed interested in avoiding any meaningful engagement with Velazquez or Sanchez as they tried to converse with him, including by rolling up the windows in his vehicle so that he would not have to talk to them.   Although Simmons attempts to portray his interactions with Velazquez and Sanchez as wholly unexceptional, "[g]reat deference is given to the judgment of trained law enforcement officers on the scene." *Chanthasouxat*, 342 F.3d at 1276 (internal quotation marks and citation omitted)).   This is because the police's experience and specialized instruction enables them to make "inferences and deductions that might well elude an untrained person." *United States v. Cortez*, 449 U.S. 411, 418 (1981).   This maxim applies to behavior which might "seem[ ] innocuous to the ordinary citizen" but which "appear[s] suspect to [an officer who is] familiar with the practices" of those engaged

in criminal activity.  *United States v. Smith*, 201 F.3d 1317, 1323 (11th Cir. 2000) (internal quotation marks and citations omitted).

Here, at the time Simmons was pulled over, Hendrix, Velazquez, and Sanchez were all seasoned cops with many traffic stops under their belts and were all well-versed in the places where firearms might be stored illegally in a vehicle.  (Doc. 63 at 8–10, 52–54, 102–04).  I found their testimony regarding their perceptions about Simmons's actions to be credible and corroborated by the evidence.  I note in the latter regard that in addition to Simmons's sometimes peculiar behavior as seen on the bodycam footage, Hendrix—as discussed earlier—can be heard questioning Simmons immediately after the firearm was spotted whether the gun was the reason he had been "acting like that."  (Doc. 54 Exhs. 1, 3).  And Sanchez can similarly be heard soon thereafter commenting that Simmons's conduct beforehand was "weird."  *Id.* at Exhs. 2, 3.  These remarks seemed genuine and spontaneous and belie Simmons's suggestion that the officers endeavored to mischaracterize his behavior after-the-fact merely to gin-up an excuse for their search of his sedan.  At a minimum, the officers' beliefs regarding Simmons's pre-search demeanor appear to have been reasonable under the circumstances presented.  *Gonzalez*, 969 F.2d at 1006.

Aside from the officers' perceptions that Simmons was behaving oddly at times, the fact that Velazquez observed a weapon under Simmons's seat and also learned from Hendrix and Simmons that Simmons was a convicted felon and did not have a

concealed carry permit[12]  alone provided probable cause for the officers to search the vehicle. (Docs. 54 Exhs. 1, 3; 63 at 62, 1113, 116). This is because—as argued by the government (Doc. 64 at 7)—there was a "fair probability" based on this information that the gun constituted evidence or contraband of Simmons's violation of Fla. Stat. § 790.23(1)(a) (2016), which prohibits a felon from possessing a firearm, and Fla. Stat. § 790.01(2) (2015), which renders it unlawful for an individual to carry a concealed weapon. *Dixon*, 901 F.3d at 1339.

Starting with the felon in possession charge, section 790.23(1)(a) states, in relevant part, that "[i]t is unlawful for any person to own or to have in his or her care, custody, possession, or control any firearm [or] ammunition" if he or she has been convicted of a felony in state or federal court. Fla. Stat. § 790.23(1)(a) (2016). "[E]ither actual or constructive possession [of a gun] will support a conviction" under this statute. *Birch v. State*, 248 So. 3d 1213, 1217 (Fla. Dist. App. Ct. 2018) (internal quotation marks and citations omitted).

Here, the circumstances known to the officers were that Simmons was the lone occupant of the Mercedes, the Taurus pistol was located under Simmons's seat and was readily accessible to him, and Simmons was a convicted felon. These circumstances were sufficient to establish probable cause that Simmons was a felon in

---

[12] Simmons does not seek to suppress his statements to Velazquez on the ground that the officers failed to Mirandize him. Accordingly, he has waived any such challenge. *See United States v. Perez-Maldonado*, 709 F. App'x 548, 549 n.1 (11th Cir. 2017) (concluding that the defendant waived arguments that were not briefed in his initial brief) (citing *United States v. Levy*, 379 F.3d 1241, 1244 (11th Cir. 2004)).

possession of a firearm.  *See Barlatier v. State*, 26 So. 3d 29, 30–33 (Fla. Dist. App. Ct. 2009) (upholding a felon in possession conviction against a driver who had a gun under his seat).  The officers' reasonable belief that Simmons was behaving unusually buttresses this conclusion, as it strengthens the inference that he was aware of the weapon and therefore knowingly possessed it.

As for the carrying a concealed weapons charge, section 790.01(2), reads in pertinent part: "[A] person . . . who carries a concealed firearm on or about his or her person commits a felony of the third degree."   Fla. Stat. § 790.01(2) (2015).   A concealed firearm is defined as "any firearm . . . which is carried on or about a person in such a manner as to conceal the firearm from the ordinary sight of another person." Fla. Stat. § 790.001(2) (2015).   Numerous courts have found a concealed weapons charge to be supported by facts similar to those present here.  *See, e.g.*, *State v. Lopez*, 980 So. 2d 1270, 1270–71 (Fla. Dist. Ct. App. 2008) (reversing the dismissal of a carrying a concealed weapons charge where the officer found a firearm directly under the driver's seat of the vehicle the defendant was driving); *J.E.S. v. State*, 931 So. 2d 276, 280–81 (Fla. Dist. Ct. App. 2006) (finding that the evidence was adequate to sustain a conviction for carrying a concealed firearm where the defendant was ordered out of the vehicle during a valid traffic stop and a legal search of the vehicle revealed a firearm hidden under the seat); *Ensor v. State*, 403 So. 2d 349, 351–53, 355 (Fla. 1981) (concluding that the trial court erred in dismissing a concealed weapons charge where the officers saw a firearm under a floormat after the defendant got out of the car as instructed following a valid traffic stop).

Simmons's efforts to undermine this probable cause showing are unpersuasive. Simmons's main contention is that Velazquez could "not possibl[y]" have seen the pistol underneath Simmons's seat due to the seat cover draped over the edge of the seat. (Doc. 65 at 10–11).  To bolster this argument, Simmons points to the screen shots from Hendrix's bodycam footage, which were admitted into evidence and which show the placement of the seat cover soon after Simmons exited the vehicle at Velazquez's insistence.  (Docs. 54 Exhs. 6A–6C; 63 at 139–41; 65 at 11).  Simmons also points to the photographs admitted into evidence, which depict both the weapon as it was found in the car, (Doc. 54 Exh. 5B), and the front seat of Simmons's car from the perspective of someone standing in the area of the B pillar, (Doc. 54 Exhs. 5A, 5C). (Doc. 65 at 11).

There are several flaws with Simmons's argument.  With respect to the photos, the ones taken from the area of the B pillar do not reflect Velazquez's line of sight when he spotted the firearm while standing near the A pillar and are therefore of no help to Simmons here.  (Doc. 54 Exhs. 5A, 5C).  At most, these photos demonstrate that Velazquez and Hendrix could not see the weapon from the B pillar, which the two officers acknowledged during their testimony.  *See* (Doc. 63 at 37–38, 126–27, 133–35).

The screen shots from Hendrix's bodycam footage present a closer question but are nonetheless unavailing.  As these screen shots and at least one of the photos reveal, the bottom part of the seat cover consisted of a flap designed to hang over the edge of the front seat.  *See* (Doc. 54 Exhs. 5C, 6A–6C); *see also* (Doc. 63 at 136).  As these

images and Velazquez's testimony also evidence, the flap was narrower than the upper part of the seat cover, which created substantial, rectangular-shaped "gaps" on either side of the flap.  (Doc. 63 at 136–37, 140, 146–47).  And Velazquez testified it was through one of these gaps—the one closer to the center console—that he was able to observe the weapon while standing at the A pillar, where he had a more direct view of the area beneath Simmons's seat.  *Id.* at 113, 127–30, 132, 146–48.  This was especially so since, as Velazquez testified, Simmons had leaned back by that point and had further separated and elevated his legs, which were bent.  *Id.* at 63, 65, 114, 117–18; (Doc. 54 Exh. 3).

Simmons contested this testimony at the evidentiary hearing, relying on the screen shots which show the flap laying on the floorboard and the wider portion of the seat cover above it lying on the seat.  (Doc. 63 at 139–41); *see also* (Docs. 54 Exhs. 3, 6A–6C; 65 at 5–6, 10–12).  As noted above, however, these screen shots were taken *after* Velazquez and Hendrix removed Simmons from the Mercedes, and there are no photos or bodycam footage that fairly depict the position of the seat cover before then.  Additionally, while there was some back and forth between defense counsel and Velazquez on this issue during Velazquez's cross-examination, Velazquez maintained that he did not remember the seat cover being situated in the manner shown in the screen shots at the time he saw the firearm.  (Doc. 63 at 136–37, 139–41, 144–45).[13]

---

[13] Velazquez recalled that Simmons "was seated on the cushion itself" and that "the lower portion, which [Velazquez originally] thought was a cloth [i.e., the flap], was hanging over, basically[.]"  (Doc. 63 at 136).  Although Velazquez initially indicated that the flap was not touching the floorboard, *id.*

Not only was Velazquez's testimony on this matter credible, it is supported by his bodycam footage.  A careful review of that recording during the time frame when Velazquez was shining his flashlight in the area where the weapon was located appears to show a plastic cup lid and a smaller metallic round bolthead[14] (Docs. 54 Exh. 3; 63 at 150), both of which—as evidenced by one of the photos (Doc. 54 Exh. 5B)—were located immediately adjacent to the firearm's handle.[15]  And it is fair to infer that Velazquez's vantage point was even better than that captured by his body camera, as his camera was affixed to his torso several inches (perhaps as much as roughly a foot) below the level of his eyes.[16]  (Doc. 63 at 106, 113–14).

It is true, as Simmons suggests (Doc. 65 at 12), that Velazquez was less certain about how the flap was situated when Simmons was being removed from his car (Doc. 63 at 144–45).  This is understandable though, as Velazquez testified that he "was watching . . . Simmons'[s] hands" at that juncture and was thus "not sure what position the seat cushion was in."  (Doc. 63 at 141).

And because Velazquez was not focused on the seat cover's location at the time, I place little weight on Simmons's attempts to impeach Velazquez on that issue using the portions of Hendrix's bodycam recording where Simmons is being pulled out of

---

at 137, he later clarified that he believed it was the wider portion of the seat cover above the flap which did not reach the ground, *id.* at 148–49.

[14] This occurs at approximately the three minute and ten second mark in the Velazquez bodycam video.  (Doc. 54 Exh. 3).

[15] Velazquez testified that he did not notice the plastic cup lid, as—per his "training and experience"—he was "looking for obvious things" of concern, such as a firearm.  (Doc. 63 at 149–50).

[16] This estimate of the distance between the body camera and Velazquez's eyes is based on Velazquez's testimony that his body camera was positioned "where [his] nipples are."  (Doc. 63 at 106).

his Mercedes. *Id.* at 143–44. Velazquez had not seen the footage before he took the stand, *id.* at 142, and all that he was essentially doing in answering questions about it was commenting on what he saw in the recording itself, not what he actually remembered witnessing when he was at the scene of the traffic stop. Regardless, despite a close examination of this same footage, I cannot discern whether, and the extent to which, the seat cushion shifted as Simmons was removed from the vehicle.

Putting aside the screen shots and the photos, other evidence before the Court also buttresses Velazquez's testimony. First and foremost is the fact that there was a firearm located under Simmons's seat just as Velazquez told Hendrix there was after he noticed it. To accept Simmons's argument that Velazquez never actually saw the weapon would mean that the presence of the gun was nothing more than a sheer confidence, a lucky guess by Velazquez if you will. Such a claim strains credulity and, by itself, undermines Simmons's challenge.

Further detracting from Simmons's argument is the video footage depicting Velazquez's deportment before and after his discovery of the pistol. In the time period leading up to that event, Velazquez's attitude towards Simmons can fairly be described as good-natured, almost jovial. *Id.* at 133. When he moved forward and shined his flashlight at an area of the floorboard, however, Velazquez's entire demeanor changed and his tone became stern and serious. (Doc. 54 Exh. 3). The urgency and decisiveness with which he then ordered Simmons out of the car, coupled with his nearly immediate and unequivocal remark about a weapon being "under the seat,"

bely any assertion that he was fabricating having spotted the weapon in the first instance. *Id.*; (Doc. 63 at 116).

I also found Velazquez's testimony consistent with the other evidence in the record as well. Velazquez advised at the hearing, for example, that he was familiar with the appearance of semi-automatic handguns like the one found beneath Simmons's seat and that he even carries such a firearm as part of his job. (Doc. 63 at 105). He additionally advised that during traffic stops, he will look for weapons "underneath the seat" for officer safety reasons. *Id.* at 110.

In sum, I find that Velazquez saw the Taurus pistol under Simmons's seat and that he, Hendrix, and Sanchez had probable cause to search Simmons's vehicle under the automobile exception.

Simmons's next challenge to the search of his Mercedes is premised on the "plain view" doctrine. (Doc. 65 at 10–16). Under that doctrine, an officer may seize evidence that is in plain view as long as (1) the officer has lawful access to the object seized, and (2) the incriminating nature of the object seized is "immediately apparent." *Horton v. California*, 496 U.S. 128, 136–37 (1990); *see also Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993) ("[I]f police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant."); *United States v. Smith*, 459 F.3d 1276, 1290 (11th Cir. 2006) ("The plain view doctrine permits a warrantless seizure where (1) an officer is lawfully located in the place from which the seized object c[an] be plainly viewed and [has] a lawful right of access to the object

itself; and (2) the incriminating character of the item is immediately apparent.")
(internal quotation marks omitted).  The plain view doctrine is grounded on the theory
that:

> if contraband is left in open view and is observed by a police officer from
> a lawful vantage point, there has been no invasion of a legitimate
> expectation of privacy and thus no "search" within the meaning of the
> Fourth Amendment—or at least no search independent of the initial
> intrusion that gave the officers their vantage point.

*Dickerson*, 508 U.S. at 375; *see also O'Rourke v. Hayes*, 378 F.3d 1201, 1208 (11th Cir.
2004) (noting that "officers have the right to make observations from any place where
they have the right to be").  The prime example of the plain view doctrine is a
"situation in which the police have a warrant to search a given area for specified
objects, and in the course of the search come across some other article of incriminating
character." *Horton*, 496 U.S. at 135 (citations omitted).

The gist of Simmons's plain view argument here is that even assuming
Velazquez could have seen the firearm under Simmons's seat, the incriminating
character of the firearm was not immediately apparent.  (Doc. 65 at 13–16). This
argument fails.

To begin, it seemingly misapprehends the nature of the plain view doctrine
itself.  That doctrine—as noted above—permits the "seizure of an item when an
officer's access to an object has some prior justification under the Fourth
Amendment." *Texas v. Brown*, 460 U.S. 730, 738 (1983).  Stated differently, the plain
view doctrine does not authorize the seizure of an item separate and apart from the

seizing officer's valid reason for being in a location in the first place. *United States v. Dabrezil*, 2013 WL 11327706, at *11 (S.D. Fla. Nov. 27, 2013) ("[T]he plain view doctrine does not justify searches or seizures separate and apart from the searching officer's valid reason for being on the premises unless the independent search or seizure is supported by probable cause.") (quoting *Johnston v. United States*, 832 F.2d 1, 3 (1st Cir. 1987)), *report and recommendation adopted*, 2013 WL 11328381 (S.D. Fla. Dec. 13, 2013), *aff'd*, 603 F. App'x 756 (11th Cir. 2015). As a result, the plain view doctrine "is perhaps better understood . . . not as an independent 'exception' to the warrant clause, but simply as an extension of whatever the prior justification for an officer's 'access to an object' may be." *Brown*, 460 U.S. at 738–39; *see also Smith*, 459 F.3d at 1290 ("The plain view doctrine allows police officers to seize any contraband in plain view if the officers have a right of access to the place where the contraband is located.").

Here, the officers did not come across the weapon under Simmons's seat during the course of a search that was grounded on a separate probable cause showing. Instead, as explained previously, they had probable cause to search the vehicle in the first place because, given the totality of the circumstances, there was a fair probability the weapon constituted evidence or contraband that Simmons was a felon in possession of a firearm and/or unlawfully carrying a concealed weapon. Either of these bases provided a sufficient justification for the officers' search of the vehicle.

Even were the plain view doctrine to apply in this case, it would still cut against Simmons's Fourth Amendment challenge. For the reasons stated above, Velazquez observed the Taurus pistol from a "lawful vantage point" outside the vehicle,

*Dickerson*, 508 U.S. at 375, and the incriminating nature of the gun was "immediately apparent" to him, at least insofar as it evidenced that Simmons was carrying a concealed weapon, *Horton*, 496 U.S. at 136–37; *Smith*, 459 F.3d at 1290.

I am similarly unpersuaded by Simmons's next argument which pertains to the "collective knowledge" doctrine.  (Doc. 65 at 16–17).  That doctrine provides that "[i]n determining whether there was probable cause, [a court] may consider the collective knowledge of law enforcement officers involved, so long as 'they maintained at least a minimal level of communication during their investigation.'"  *United States v. Willix*, 2018 WL 705643, at *3 (11th Cir. Feb. 5, 2018) (quoting *United States v. Willis*, 759 F.2d 1486, 1494 (11th Cir. 1985)); *see also Terrell v. Smith*, 668 F.3d 1244, 1252 (11th Cir. 2012) (noting that it is well-established that collective knowledge of investigating officers may be imputed to each participating officer).

Here, Simmons asserts that the government cannot ground its probable cause showing on the collective knowledge of Velazquez, Hendrix, and Sanchez because they "were not functioning as a team at the time of the traffic stop."  (Doc. 65 at 17). This argument is misplaced.  As detailed above, before Hendrix searched Simmons's car, Velazquez spotted the weapon beneath Simmons's seat, conveyed that discovery to Hendrix, and learned from Hendrix (as well as from Simmons) that Simmons was a convicted felon and lacked a concealed carry permit.  Because Velazquez obtained all the relevant information himself and then shared it directly with Hendrix (who knew some of it already), Simmons's collective knowledge argument cannot stand. *See United States v. Marsh*, 663 F. App'x 888, 893 (11th Cir. 2016) ("Observations and

other information supplied by officers involved in a common investigation can, taken together, create probable cause for a search.") (internal quotation marks and citation omitted).

Simmons's next contention is that the items seized from his car, along with the statements he made after he was detained and the results of a subsequent DNA swab of his cheek, should be suppressed under the "fruit of the poisonous tree" doctrine. (Doc. 65 at 1).  This argument can be readily disposed of.  In assessing whether evidence is "fruit of the poisonous tree" and, therefore, subject to exclusion, the relevant question for a court is "'whether, granting establishment of the primary illegality, the evidence to which [the] instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'"  *United States v. Davis*, 313 F.3d 1300, 1302–03 (11th Cir. 2002) (per curiam) (quoting *Wong Sun v. United States*, 371 U.S. 471, 488 (1963)). Because there was no primary illegality here, there is no fruit of the poisonous tree. This argument is thus meritless as well.

One final item bears mentioning.  In his proposed findings of fact and conclusions of law, Simmons asserts that he was "improper[ly]" and "unlawful[ly]" detained when he was removed from his vehicle.  (Doc. 65 at 15).  To the extent that Simmons seeks to rely on this argument to bolster his suppression motion, the argument fails.

The Supreme Court has long recognized the safety concerns that accompany traffic stops.  *See Arizona v. Johnson*, 555 U.S. 323, 330 (2009) (citing *Michigan v. Long*, 463 U.S. 1032, 1047 (1983)).  As the Court explained in *Johnson*:

> [T]raffic stops are "especially fraught with danger to police officers." *Michigan*[,] 463 U.S. [at] 1047[.]  "'The risk of harm to both the police and the occupants [of a stopped vehicle] is minimized . . . if the officers routinely exercise unquestioned command of the situation.'"  *Maryland v. Wilson*, 519 U.S. 408, 414 [ ] (1997) (quoting *Michigan v. Summers*, 452 U.S. 692, 702–03 [ ] (1981)) . . . .

*Id.* at 330–31.

Consistent with *Johnson* and as referenced previously, a police officer's "mission" as part of a traffic stop is to attend to any "'related safety concerns.'" *Johnson v. Nocco*, 83 F.4th 896, 903 (11th Cir. 2023) (quoting *Rodriguez v. United States*, 575 U.S. 348, 354 (2015)).  This includes asking a driver to step out of his vehicle. *Johnson*, 555 U.S. at 331 ("[O]nce a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures.") (quoting *Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977)); *Nocco*, 83 F.4th at 904 (stating that an officer may "ask[ the] driver to step out of his vehicle—not as part of [the officer's] mission, but as an additional, incremental, and reasonable intrusion" on the driver's personal liberty); *United States v. Spoerke*, 568 F.3d 1236, 1248 (11th Cir. 2009) ("During a lawful traffic stop, officers also may take steps that are reasonably necessary to protect their personal safety, . . . including requiring the driver and passengers to exit the vehicle 'as a matter of course.'") (citing *Maryland v. Wilson*,

519 U.S. 408, 410 (1997); *Mimms*, 434 U.S. at 110–12; *United States v. Purcell*, 236 F.3d 1274, 1277 (11th Cir. 2001)).  As another court in this District has observed in this regard:

> While an officer may only have probable cause to believe a driver has committed a minor traffic violation, "the risk of a violent encounter in a traffic-stop setting stems not from the ordinary reaction of a motorist stopped for a [traffic] violation, but from the fact that evidence of a more serious crime might be uncovered during the stop."

*Tarantino v. Citrus Cnty. Gov't*, 2014 WL 4385550, at *4 (M.D. Fla. Sept. 4, 2014) (quoting *Johnson*, 555 U.S. at 331).

In this case, Velazquez testified that he removed Simmons from his car and handcuffed him for officer safety reasons.  (Doc. 63 at 115).  This action by Velazquez was reasonable considering the totality of the circumstances, including the presence of a firearm directly under Simmons's seat and the fact that the traffic stop unfolded in a high-crime area.  *See Long*, 463 U.S. at 1051 (recognizing that officers may take reasonable steps to ensure their safety so long as they possess "an articulable and objectively reasonable belief that the suspect is potentially dangerous"); *Purcell*, 236 F.3d at 1277 ("It is well established that officers conducting a traffic stop may 'take such steps as [are] reasonably necessary to protect their personal safety.'"); *United States v. Hastamorir*, 881 F.2d 1551, 1157 (11th Cir. 1989) (finding that law enforcement agents' handcuffing of an occupant of a vehicle was "a reasonable action designed to provide for the safety of the agents" where the agents "reasonably believed" there was "a potential threat to their safety"); *United States v. Ordaz*, 2021 WL 862357, at *5

(M.D. Fla. Feb. 18, 2021) (finding that an officer "was justified in opening the driver's door to remove [defendant] from the [vehicle]" given the known history of the vehicle previously fleeing the police and defendant's attempt to back away from the officer making the stop) (citing *Mimms*, 434 U.S. at 109–11)), *report and recommendation adopted*, 2021 WL 1399809 (M.D. Fla. Apr. 14, 2021).  Accordingly, any challenge by Simmons to the lawfulness of his detention immediately following the discovery of the Taurus semi-automatic pistol should be rejected.

III.

In light of the foregoing, I respectfully recommend that Simmons's motion to suppress (Doc. 38) be denied.

Respectfully submitted this 26th day of January 2024.

HONORABLE CHRISTOPHER P. TUITE
United States Magistrate Judge

**NOTICE TO PARTIES**

A party has fourteen (14) days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions.  A party's failure to file written objections, or to move for an extension of time to do so, waives that party's right to challenge on appeal any unobjected-to factual finding(s) or legal

conclusion(s) the District Judge adopts from the Report and Recommendation.  *See*

11th Cir. R. 3-1; 28 U.S.C. § 636(b)(1).


Copies to:
Honorable Steven D. Merryday, United States District Judge
Counsel of record